IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| PAMELA J. SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 06-0852-CV-W-NKL-SSA |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social | ) | |
| Security Administration | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

Pending before the Court is Plaintiff Pamela J. Smith's ("Plaintiff" or "Smith") Motion for Summary Judgment [Doc. # 4]. Smith seeks judicial review of the Commissioner's denial of her requests for disability insurance benefits under Title II of the Act, 42 U.S.C. §§ 401, et seq., and supplemental security income (SSI) benefits based on disability under Title XVI of the Act, 42 U.S.C. §§ 1381, et seq. The complete facts and arguments are presented in the parties' briefs and will be duplicated here only to the extent necessary.[1] Because the Court finds that the Administrative Law Judge's decision is not supported by substantial evidence in the record as a whole, the Court reverses and awards benefits to Smith.

**I.     Factual Background**

---

[1]Portions of the parties' briefs are quoted without citation designated.

1

### A. Medical Records

After two days of shortness of breath and a tightening chest, Smith went to the Truman Medical Center-West on January 28, 2002. She was discharged on January 30, 2002, with diagnoses of congestive heart failure secondary to hypertensive changes of the heart, chest pain, diabetes mellitus, obesity, and hypertension. She was allowed to return to activity as tolerated and was given several medications. She was also told to have a sleep study to evaluate for sleep apnea affecting primary pulmonary hypertension. (T. 111-113.)

On February 13, 2002, she saw Dr. Sirajuddin at the Truman Clinic who noted that her ability to walk had increased to about eight blocks, but she still had edema in her lower extremities and daytime lethargy. Her affect was flat and she was prescribed antidepressants. (T. 183.) On February 15, 2002, she underwent a sleep study indicating 53 apneas and hypopneas during 3.2 hours of total sleep time. Her doctor recommended that she use a CPAP. (T. 177.) She had a pulmonary function test on March 7, 2002, which showed a moderate decrease lung capacity. (T. 174-176.)

Dr. Doshi at the Truman Clinic examined Smith on August 28, 2002, for increasing pain in her back and lower extremities that increased with activity. She was also experiencing swelling in her lower extremities, and her medication was not controlling her pain. (T. 152.) She had nonpitting edema in her lower extremities and tenderness to deep palpation. Her affect was flat, and she was withdrawn. Dr. Doshi surmised that her pain was likely neuropathic and related to her diabetes. He continued

her antidepressants and prescribed additional medication for her other symptoms. (T. 153.)

Smith was admitted to the hospital again on February 24, 2003, for headaches. An MRI showed a small focus in the right frontal horn, which could represent a small chronic hemorrhage. She was discharged on February 28, 2003, with diagnoses of migraine headaches, diabetes mellitus type 2 uncontrolled, hypertension, and obstructive sleep apnea, and told to follow up with a neurologist. (T. 122-23.)

Plaintiff visited Truman Clinic again on March 20, 2003, and was examined by Dr. Keeler. She was experiencing shortness of breath with exertion. She had been taking Lantus since she was in the hospital, but it was making her jittery. (T. 139.) There were diminished breath sounds bilaterally and pitting edema in her ankles. He diagnosed uncontrolled hypertension and congestive heart failure symptoms, so he started her back on Lasix. He also decided to continue her Lantus for diabetes, suspecting that her jitteriness might be related to anxiety. (T. 140.)

Smith saw Dr. Chang and Dr. Anis on June 18, 2003. Her chest pain, headache, blurry vision, general lethargy, and paresthesias were somewhat better, but she was experiencing muscle spasms since starting Norvasc. She was also having mood swings with her periods. The doctors continued her medications but increased her Lantus to better control her diabetes. (T. 135-36.)

When Smith was seen at the clinic again on September 11, 2003, she was severely depressed and cried when discussing her back and leg pain. Because of her pain and

depression, she often stayed in bed all day and did not eat, which exacerbated the control of her blood sugar. Financial problems were preventing her from getting medication and contributing to her depression. She admitted to suicidal ideation. Dr. Johnson elected to increase her antidepressants and advised her to seek counseling at church. The doctor was going to have Social Services evaluate her for other options. (T. 222.) On October 23, 2003, Plaintiff reported poorly controlled depression and increased breathing trouble at night even when using her CPAP. (T. 219.) She showed minimal wheezing and somewhat better mood. Dr. Johnson increased all her medications. (T. 220.) On December 8, 2003, Smith was not doing well with severe depression and shortness of breath, but she was not experiencing edema that day. Dr. Beardman referred her to a mental health provider and increased her Lantus for the uncontrolled diabetes. (T. 217.)

On March 29, 2004, she reported that she had not followed up with the psychiatrist. She was having nausea and vomiting at least once a day and was still feeling depressed. (T. 214.) She had a rapid heartbeat, loud bowel sounds and tenderness in her abdomen. She had lost some weight and although she had no edema in her feet, they did hurt. Her mood and affect were flat although she was able to laugh a little. The doctor diagnosed probable constipation. Her Elavil was increased to help with her neuropathy, and she was encouraged to follow up with the behavioral health clinic. (T. 215.)

Smith went to the emergency room in April 2004 with chest pain, nausea, sweating, and shortness of breath. (T. 204.) She underwent cardiac catheterization,

4

which showed some mild coronary artery disease, evidence of small vessel coronary artery disease, and 80% narrowing of the right femoral artery. (T. 211.) Her diagnoses upon discharge were chest pain secondary to unstable angina and nonocclusive coronary artery disease, hypertension, type 2 diabetes mellitus, obesity, obstructive sleep apnea, and depression. She was given several refills of her prescriptions and vitamins. (T. 202.)

She returned to the Truman Clinic on August 30, 2004, with occasional chest pain and back pain. The behavioral health clinic had added Effexor to her medication. (T. 201.) She saw the doctor again on September 27, 2004, and reported nausea and vomiting for two months as well as chest pain exacerbated by activity. She had applied for Medicaid but could not get medications until she was approved. She was experiencing dizziness and numbness around her mouth and tongue. There was mildly decreased sensation in her lower extremities. (T. 198.) She was referred to a cardiologist for her chest pain and to a vascular specialist to perform Doppler studies of her legs given the blockage of her femoral artery. Several medications were changed because she could not afford the ones she had been taking. (T. 199.) The Doppler studies were normal. (T. 196.)

Smith saw her psychiatrist on November 23, 2004. She had been out of medication for four weeks and had experienced a relapse, and she had missed appointments because of transportation problems. Her medication had been very helpful, though she still complained of auditory hallucinations, but she could not afford her medication. (T. 240.) Her mood was depressed, and her affect was cycling rapidly. She

had little eye contact and had slowed activity. She was incapable of feeling pleasure and socially isolative. She was given prescriptions for Effexor XR and Seroquel and was told to discontinue Elavil. (T. 241-42.)

On December 6, 2004, her doctor at the clinic noted that she was not experiencing any organ problems yet but that she was not completely compliant with her diabetic regime due to her finances. She was still having chest pain on exertion. (T. 193.) Her medications were continued, and she was referred to pulmonary for her sleep apnea. (T. 194.) On December 10, 2004, Truman Medical Center's Behavioral Health Network diagnosed Smith with major depressive disorder, recurrent which was severe with psychotic features. (T. 243.) She reported feeling very depressed and hearing voices. She had been hospitalized three to four years ago for suicidal ideation, and she had a history of self-mutilation and homicidal ideation. She had dysphoric mood with constricted affect; soft, slow speech; and auditory hallucinations. Her diagnosis was amended to include psychotic features. (T. 244.) She was staying in the house most of the time and tended to isolate herself. (T. 246.) On December 14, 2004, she reported feeling somewhat better on her medications and wanted to continue counseling. (T. 237.)

Smith went to the Behavioral Health Network again on February 4, 2005. She reported that Remeron had helped her sleep for three hours at a time. She reported having more energy but was still isolative and socially anxious. (T. 233.) Her motor activity was decreased, her mood was depressed, and her affect was blunted. (T. 234.) Her diagnosis was still major depressive disorder with psychotic features. She was to stop

6

Elavil, taper off Zoloft, increase Remeron, and see the psychotherapist. She was also to continue taking Effexor. (T. 235.)

On May 13, 2005, she reported depressed mood, poor attention and concentration, sleep changes, social phobia with paranoid ideation, mood hyperreactivity, and rejection hypersensitivity. She was tearful with a depressed affect and psychomotor slowing. She also had suicidal ideation. Her symptoms had led to significant impairment in social and occupational functioning and significant psychosocial stressors. (T. 230.) She felt that her medication was helpful, having decreased her auditory hallucinations. She had problems being around people or in crowds, becoming fearful and paranoid. She spoke with her eyes closed. Her Zoloft was discontinued and her Remeron was decreased. (T. 231.)

Smith underwent a sleep study on June 7, 2005. Her sleep architecture was disturbed with increased light sleep, decreased REM sleep, and a short sleep latency indicative of excessive sleepiness. She also had moderate sleep apnea/hypopnea. (T. 262.) A pulmonary function test on June 8, 2005, showed minimal airway obstruction, high diffusing capacity, and reduced lung volume. (T. 258.) She underwent another sleep study for CPAP titration. The CPAP effectively controlled her apnea, but her sleep architecture was still disturbed. (T. 249.)

On August 4, 2005, Plaintiff returned to the emergency room at St. Luke's Hospital. She was diagnosed with musculoskeletal flank pain. (T. 285.) She was given a prescription for Vicodin but returned shortly to say that she was allergic to that

7

medication, so the doctor switched her to Darvocet. (T. 278-79.)

She saw a rheumatologist on October 4, 2005, at Truman Medical Center West for diffuse body pain. She also complained of feeling fatigued and tired and feeling depressed. (T. 316.) On examination, she had diffuse tenderness in all of her joints. She also exhibited a pins and needles sensation and multiple positive tender points. The doctor also noted diminished sensation over both feet. (T. 317.) Plaintiff had x-rays of her hands, knees, and hips, which showed minimal to mild degenerative changes. (T. 302.) Based on these findings, the doctor diagnosed fibromyalgia, osteoarthritis of the knees, abnormal sleep, depression, and carpal tunnel. He referred her to physical therapy for a stretching and strengthening program and to occupational therapy for wrist splints. (T. 317.)

On February 10, 2006, Plaintiff visited St. Luke's emergency department for shortness of breath and cough. (T. 328.). She was diagnosed with bronchospasm and acute bronchitis and given a prescription for a Z-pak. (T. 329.) She returned to Truman Medical on February 27, 2006. She was having problems with Medicaid and had been out of medication. She was also having problems with chronic leg and foot pain resulting from her diabetes, and she was having shortness of breath and chest tightness as well as back pain, which she thought was from Lipitor. (T. 299.) She was assessed with multiple complicated and uncontrolled medical problems that were exacerbated by her inability to get medication and by her psychiatric issues. (T. 300.)

She returned to the emergency room at St. Luke's the next day with shortness of

breath, cough, chest tightness, and pain. She had not been able to afford the medication prescribed at her last visit. (T. 336.) She also had tenderness in her abdomen, but a CT scan was normal. The doctor diagnosed a viral syndrome and abdominal pain. (T. 337.)

On March 22, 2006, she saw a clinician at Behavior Health Network again. She complained of depression and difficulty getting along with others. She was isolating herself and making paranoid statements, and she was irritable. She had problems with anger control. (T. 321.) She exhibited poor recent memory, blaming others, and tangential thought processes. She was hearing voices. (T. 324.) She was diagnosed with major depression, recurrent, severe, with psychotic features and assigned a GAF of 45. (T. 326.)

### B. Smith's Hearing Testimony

Smith testified at a hearing before the ALJ that she was 43 years old, 6'2" tall and weighs 285 pounds. She lives alone in public housing, has completed high school and is able to read and write. (T. 359.) She is trained as a certified nurse's assistant, medication tech, and phlebotomist. She has worked in various hospitals over the years until about 2002. Since then, both physical and mental problems have kept her her from working. She suffers from pain and numbness in her feet and legs from diabetes, which prevent her from walking very much. (T. 361.) She was taking medication for her diabetes until she had problems with Medicaid. She usually goes to St. Luke's or Truman West and receives treatment for her mental problems at Truman as well. She went regularly until her doctor moved, and she is afraid of the new doctor. She does not take any medication

9

now but has an appointment coming up. (T. 362.)

She can go to the store and has access to a car to get there. She cannot stay in the store very long, because she gets too paranoid. Otherwise, she is outside the home only for family activities, such as dinner at her sister's house. She used to go to church but does not any longer. (T. 363.) She used to like to bowl, dance, swim, and walk but cannot participate in those activities now. (T. 364.) Smith estimated that she could stand for 30 to 45 minutes at a time. If she has been in a store for very long, she cannot bear to stand in line and sometimes leaves her groceries if she cannot check out right away. She estimated that she could sit for a couple of hours, but her back would be stiff when she got up. She usually changes positions quite a bit. She estimated that she could walk a block and lift 20 to 30 pounds.

Smith testified that she cannot work due to depression, paranoia, inability to walk much, and problems with her hands. She has been prescribed medication but cannot get it because of her Medicaid problems. (T. 364.) Her Medicaid was canceled because she was not able to get her doctor to sign papers within a specified time. (T. 366.) She has reapplied for Medicaid and is waiting for that process. (T. 367.) Truman gave her a sample of her blood pressure medication. (T. 366.)

Smith sometimes initiates contact with other people. She goes out in public very seldom because she gets too nervous. When she goes to the store, people look at her or say things about her. (T. 367.) Sometimes she hears voices, and sometimes she is very anxious. The paranoia and anxiety can occur whether she is around strangers or

10

family or even when she is home by herself. She hears voices daily. If they are cutting the grass too close to her window, she has to go in the bathroom and shut the door because she thinks they are looking in or trying to say something to her through the window. She has to close the blinds. (T. 368.) Sometimes she hears a whispering noise, and sometimes she can hear an entire conversation. (T. 369.) It is usually related to harming herself, and she has acted on the voices before. She also cries, has mood swings, gets agitated, and feels worthless. She makes her bed frequently because of anxiety. She showers several times a day because she does not know if she is clean. (T. 370.) Some of her problems were better with medication, and she could function a little bit better. She was able to sit on her porch for a little while. (T. 371.) She does not think that she would be able to sit and concentrate on one thing for very long. (T. 372.) She leaves her house two or three times a week, but it is often during the night or early in the morning. She might check her mail at 2:00 a.m. because there are not other people out. (T. 375.)

When she was a teenager, she used drugs and alcohol. Now, she does not seek it out but will smoke marijuana if someone has it around. (T. 389.) She has also used a combination of PCP and marijuana, most recently a month and a half before the hearing when someone brought some to her house. She has not used alcohol in a long time. She has smoked marijuana or the combination about once a month during the last year, especially when she feels like it does not matter if she lives or dies. (T. 390.)

### C. Medical Expert, Dr. Richard Watts

Dr. Watts, a consulting physician who reviewed Smith's records in conjunction

11

with her disability hearing, testified that Smith's diabetes has mildly affected her kidney and neurologic function. She also has pulmonary problems, which is not unusual given her weight. (T. 383.) According to her first sleep test, she was fairly hypoxic during sleep but did not tolerate the CPAP mask well. Labs showed a high level of carboxyhemoglobin, which is an indication that she smoked a lot. (T. 384.) Her weight loss from 350 pounds to 294 pounds has been part of the reason that her subsequent sleep tests and pulmonary function tests have been better. (T. 385.)

Watts found that Smith has had hypertension, obesity, single-vessel coronary disease that is not hemodynamically significant as far as he can tell, and diabetes, which has not caused any significant end organ damage but which shows early evidence of nephropathy and neuropathy. She also has sleep apnea and no significant limitation in pulmonary function testing. (T. 386.)

While Dr. Watts indicated that Smith does not meet a listing, he believed she was limited to sedentary work due to her lower extremity problems. She would be limited to occasionally climbing stairs and should not use ladders or scaffolds, squat, stoop, crawl, or crouch. She should also not be in a hazardous atmosphere, around moving machinery, or at unprotected heights.

As for Smith's mental impairments, Dr. Watts testified that "I don't really have enough in terms of following things in a mental residual functional capacity. And, unfortunately, I didn't see any evaluation of that by anybody more fit to do that than I am." (T. 388.) After some initial confusion over whether he was looking at the correct

12

portion of her records, he did note that "she does indeed have some problems in that." (T. 386.) He noted she had a history of suicidal ideation, major depressive disorder that was recurrent and severe with psychotic features. She experienced auditory hallucinations of derogatory comments and had a GAF of 50 and one at 45 at two different points. He noted some indication of drug use in marginal notes, but stated that "I didn't pick this up anywhere else." (T. 387). Despite his statement that he didn't have enough information to go on and that no one more qualified than he had ever performed a mental residual functional capacity assessment, he maintained his opinion that Smith did not meet any disability listing.

### D. **Vocational Expert Lisa Keen**

The Vocational Expert ("VE") testified that Smith had worked as a certified nurse's assistant (CNA), which is semi-skilled in the very heavy exertional level. It is classified by the DOT at the medium level, but she has never seen it actually performed at this level. She was also a certified medication aide, which is semi-skilled which was performed at the light level. It is common for these two jobs to be performed together. (T. 391.)

The ALJ asked the VE to consider a person who can lift 20 pounds occasionally and ten pounds frequently; can walk/stand for two hours per day; can sit for six hours per day; should avoid hazardous moving equipment or machinery; can drive; has mild limitation on activities of daily living; and has moderate limitations, defined as having some difficulty but can still function satisfactorily, in being able to interact with the

13

general public and being able to concentrate or persist for extended periods of time. (T. 391-92.) The VE testified that, with these limitations, Smith could not perform her past work. However, she could work as a surveillance system monitor, wire patcher, optical goods assembler, all of which existed in significant numbers in the national and local economies. (T. 392.)

Assuming that Smith's limitations in dealing with the public were marked, the VE testified that she would not be able to perform those jobs. If Smith missed work two days a month on average, there would be no jobs that she could perform. She also would not be able to work if she had to take a total of one hour of extra breaks per day. (T. 392-93.)

## II.     Discussion

Following the hearing, the ALJ issued an opinion in which she found that Smith had the following severe impairments: hypertension, obesity, sleep apnea, cardiovascular disease, diabetes, major depressive disorder, and a history of polysubstance abuse. The ALJ also found that Smith could not return to her past relevant work. (T. 16.) Nevertheless, the ALJ concluded that Smith was not precluded from all work because she retained the residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently, to stand and walk two hours in an eight-hour day, and sit for six hours in an eight-hour day. In addition, the ALJ found that Smith "has moderate limitations with concentration, persistence and pace as well as moderate difficulties interacting appropriately with supervisors, co-workers and the general public. The claimant also has mild limitations in the activities of daily living." (T. 16.)

14

It is unclear what evidence in the record the ALJ based these latter findings on. She noted in her opinion that "The medical expert noted that the claimant appeared to have some mental problems related to depression; however, his evaluation focused almost exclusively on her physical problems." (T. 13.) This is something of an understatement. Dr. Watts testified, "I don't really have enough in terms of following things in a mental residual functional capacity. And, unfortunately, I didn't see any evaluation of that by anybody more fit to do that than I am." (T. 388.) When the ALJ stated that she found "no evidence that the combined clinical findings from such impairments reach the level of severity contemplated in the Listing of Impairments," she noted that "[t]he medical expert specifically made such a finding based upon his assessment of the evidence." (T. 14.) These statements are not supported by substantial evidence as the medical expert admitted he didn't have enough information to form an opinion as to Smith's mental residual functional capacity and that no one more qualified than he had ever done so.

The ALJ also suggested that "[m]any of the claimants difficulties . . . have been caused by her failure to follow prescribed treatment or take prescribed medication." She also noted that Smith "continues to succumb to substance abuse." While Smith admitted to smoking marijuana and using PCP occasionally, there is no evidence in the record as to which if any of her claimed disabilities might be caused by or exacerbated by drug use. Indeed, other than a few marginal notes in medical reports indicating possible drug use, Dr. Watts "didn't pick . . . up [on it] anywhere else" in her medical records. (T. 387.) As for her failure to maintain her prescribed levels of medications, Smith testified that she

15

had financial difficulty obtaining some of her drugs. The ALJ suggests that had Smith stopped smoking she could have afforded her prescriptions, *see Riggins v. Apfel*, 177 F.3d 689, 693 (8th Cir. 1999) (claims of inability to afford medication discredited when claimant "chose to forego smoking three packs of cigarettes a day to help finance pain medication"), but there is no evidence in the record as to the costs of the medications involved or the amount Smith spends on cigarettes to support this assumption.

Smith sustained her burden of showing that she could not perform her past relevant work. The burden, therefore, shifted to the Commissioner to prove that she could perform other work. To meet this burden, the ALJ presented a hypothetical question to the vocational expert. That hypothetical question, however, did not adequately reflect Smith's well documented mental health problems. For that reason, there is not substantial evidence to support the ALJ's denial of benefits.

**III. Conclusion**

Accordingly, it is hereby

ORDERED that Plaintiff Smith's Motion for Summary Judgment is GRANTED. The decision of the ALJ is REVERSED and the Commissioner is instructed to pay benefits to Smith.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: May 7, 2007
Jefferson City, Missouri